OPINION OF THE COURT
 

 Bellacosa, J.
 

 Plaintiff-appellant Palka, a registered nurse employed by Ellis Hospital in the City of Schenectady, was injured in 1987 while performing her nursing duties. An oscillating wall-mounted fan fell on her from its wooden mount as she attended to a patient. The nurse’s negligence action against defendant Servicemaster Management Services Corporation derives from that company’s contractual obligations to the hospital, for a biweekly payment of $91,207, to develop and implement a maintenance program for the hospital premises, among other specified functions. The question framed within the boundaries of this record is whether Servicemaster should be answerable to Palka for tortiously inflicted personal injuries arising from defendant’s negligent or failed performance of the contractual obligations to Ellis Hospital in the first instance. We conclude it should be.
 

 L
 

 Two years before the accident, Servicemaster contracted with Ellis Hospital to provide management services, which included, in part, the duty to "train, manage and direct” all support service employees of the hospital, expressly including the hospital’s maintenance department. Defendant did not install the preexisting wall-mounted fans. From 1982 through 1985, the hospital supervised its own maintenance department
 
 *583
 
 and employees, and included a safety inspection of the fans and mountings in all rooms in its operations. Room fan inspections ceased when Servicemaster assumed maintenance responsibilities for the hospital premises in 1985.
 

 At the conclusion of the liability portion of plaintiff’s case, tried before a jury which answered questions on a special verdict, defendant moved for a directed verdict. It argued that it owed no duty to plaintiff. Supreme Court denied the motion and let the jury’s verdict stand in plaintiffs favor. On defendant’s appeal, the Appellate Division reversed and by a vote of 3 to 2 dismissed the complaint. Relying principally on
 
 Eaves Brooks Costume Co. v Y.B.H. Realty Corp.
 
 (76 NY2d 220), that Court’s majority held that "defendant neither owed a cognizable duty to plaintiff nor assumed a duty to act in this instance” (195 AD2d 638, 639). The dissenting Justices would have upheld the jury verdict. Under the circumstances and evidence adduced in this case, we conclude that Servicemaster assumed a duty to act. Negligent failure to perform it may thus render Servicemaster liable to plaintiff. Accordingly, the order of the Appellate Division, appealed as of right by plaintiff on the two-Justice dissent, should be reversed and the judgment based on the jury verdict on liability in plaintiffs favor should be reinstated.
 

 II
 

 In particular, Servicemaster denies that its contractual responsibilities to Ellis Hospital encompassed inspection of the wall-mounted fans. Their contract, entitled "General Services and Plant Operations and Maintenance,” delineated defendant’s duties into three separate categories: Housekeeping Services, Quality Control, and General Services. Servicemaster agreed to furnish all coordinating management, training and technical personnel needed to accomplish the support services; train, manage, supervise and direct all support service employees in the performance of their respective duties; perform all administrative duties relating to support service employees; supply materials for housekeeping; pay all direct operating costs and expenses required in the performance of the support services; and provide and maintain the daily work and project schedules, standard operating procedures and training manuals. Ellis Hospital paid Servicemaster $91,207 biweekly for taking charge of these functions. In addition, Servicemaster agreed to indemnify and hold Ellis Hospital
 
 *584
 
 harmless as to any liability which may be imposed against the hospital by reason of any acts or omissions of Servicemaster.
 

 The contract makes no specific mention of fan maintenance and contains no provision requiring a general inspection program. Paul Brown, the Director of Plant Operations for Servicemaster, testified at trial, however, that part of Service-master’s general duties was "to create a clean and safe environment” for employees and patients, to reduce safety hazards and to engage in
 
 "preventative maintenance and casualty control or casualty prevention,”
 
 defined as
 
 "primarily one of inspection and checking to see if something needs repairing before it falls”
 
 (emphasis added). Brown added that it was Servicemaster’s responsibility to provide leadership necessary for the effective coordination of plant maintenance and to run a program of inspection and preventative maintenance. He further testified that it was Servicemaster’s responsibility to instruct Ellis Hospital’s maintenance department employees on how and when to perform maintenance on all electrical and mechanical equipment. In furtherance of its contractual duty to provide "preventative maintenance,” Servicemaster directed the hospital’s floor mechanics to speak with each head nurse with respect to necessary repairs.
 

 This evidence, coupled with the specifications of the contract itself, belie Servicemaster’s denial of any contractual responsibility to supervise a preventative maintenance program, which particularly included the inspection and repair of the wall-mounted hospital fans. Plainly, its extensive privatization arrangement displaced entirely the hospital’s prior in-house maintenance program and substituted an exclusive responsibility in Servicemaster to perform all of Ellis Hospital’s pertinent nonmedical, preventative, safety inspection and repair service functions.
 

 ¡IL
 

 Servicemaster’s responsibility to Ellis Hospital to inspect and repair, however, does not automatically make it liable in tort for this noncontracting plaintiffs injuries. That issue requires an examination of whether Servicemaster’s duties extend beyond its relationship with Ellis Hospital, and if so, how far out and on what policy and analytical bases.
 

 We start this part of the analysis with the proposition that a duty of reasonable care owed by a tortfeasor to an injured party is elemental to any recovery in negligence
 
 (see, Eiseman
 
 
 *585
 

 v State of New York,
 
 70 NY2d 175, 187;
 
 Turcotte v Fell,
 
 68 NY2d 432, 437;
 
 Akins v Glens Falls City School Dist.,
 
 53 NY2d 325;
 
 Pulka v Edelman,
 
 40 NY2d 781). Unlike foreseeability and causation, which are issues generally and more suitably entrusted to fact finder adjudication, the definition of the existence and scope of an alleged tortfeasor’s duty is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration
 
 (see, Eaves Brooks Costume Co. v Y.B.H. Realty Corp.,
 
 76 NY2d 220, 226,
 
 supra; Waters v New York City Hous. Auth.,
 
 69 NY2d 225, 229;
 
 De Angelis v Lutheran Med. Ctr.,
 
 58 NY2d 1053, 1055). Common-law experience teaches that duty is not something derived or discerned from an algebraic formula. Rather, it coalesces from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of responsibility. These sources contribute to pinpointing and apportioning of societal risks and to an allocation of burdens of loss and reparation on a fair, prudent basis
 
 (see, De Angelis v Lutheran Med. Ctr., supra; Micallef v Miehle Co.,
 
 39 NY2d 376, 385;
 
 Codling v Paglia, 32
 
 NY2d 330, 340).
 

 Chief Judge Cardozo sagely instructed all who have continued to search for this shimmering line of duty in endless fact patterns and juridical relationships with the now familiar axiom that "[t]he risk reasonably to be perceived defines the duty to be obeyed,
 
 and risk imports relation” (Palsgraf v Long Is. R. R. Co.,
 
 248 NY 339, 344 [emphasis added]). It has been said, with additional words, that " 'whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he [or she] did not use ordinary care and skill in his [or her] own conduct with regard to the circumstances he [or she] would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger’ ”
 
 (Havas v Victory Paper Stock Co.,
 
 49 NY2d 381, 386, quoting
 
 Heaven v Pender,
 
 11 QBD 503, 509, Brett, MR [1883]). Thus, we have come to recognize that while the existence of a duty involves scrutiny of the wrongfulness of a defendant’s action or inaction, it correspondingly necessitates an examination of an injured person’s reasonable expectation of the care owed and the basis for the expectation and the legal imposition of a duty
 
 (see, Turcotte v Fell,
 
 68 NY2d 432, 437,
 
 supra).
 

 All persons entering Ellis Hospital surely hold a reasonable expectation that someone is in charge of and responsible for
 
 *586
 
 basic safety inspections and maintenance of equipment and the premises. Defendant untenably disclaims responsibility in this regard on this record. Yet, its contract and its manager demonstrably point to its singular obligation to carry out and carry on with these essential functions. We do not countenance the view that no one has these duties and we conclude that Servicemaster undertook them.
 

 The interwoven question then is to whom the duty to use reasonable care in the performance of these duties is owed. In this case, this is not solely a matter between the parties to the contract. The arrangements between Servicemaster and Ellis Hospital plainly affect the safety of all users of the premises who are entitled to rely on the nonnegligent maintenance services and repair responsibilities imposed by the contract
 
 (see, White v Guarente,
 
 43 NY2d 356;
 
 Dickerhof v Port Auth. of N. Y. & N. J.,
 
 174 AD2d 506, 507).
 

 Not uncommonly, parties outside a contract are permitted to sue for tort damages arising out of negligently performed or omitted contractual duties
 
 (see, Glanzer v Shepard,
 
 233 NY 236;
 
 MacPherson v Buick Motor Co.,
 
 217 NY 382;
 
 Fish v Waverly Elec. Light & Power Co.,
 
 189 NY 336;
 
 see also, Hall v United Parcel Serv.,
 
 76 NY2d 27, 32). Additional guidance is again provided by that vast resource, Judge Cardozo: "There is nothing anomalous in a rule which imposes upon A, who has contracted with B, a duty to C and D and others according as he knows or does not know that the subject-matter of the contract is intended for their use”
 
 (MacPherson v Buick Motor Co., supra,
 
 at 393).
 

 On the other hand, the boundaries of duty are not simply contracted or expanded by the notion of foreseeability, for if it were, "[ejvery one making a promise having the quality of a contract will be under a duty to the promisee by virtue of the promise, but under another duty, apart from contract, to an indefinite number of potential beneficiaries when performance has begun”
 
 (Moch Co. v Rensselaer Water Co.,
 
 247 NY 160, 168;
 
 see, Beck v FMC Corp.,
 
 42 NY2d 1027,
 
 affg
 
 53 AD2d 118;
 
 Tobin v Grossman,
 
 24 NY2d 609). Courts traditionally and as part of the common-law process fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability.
 

 
 *587
 
 To limit an open-ended range of tort duty arising out of contractual breaches, injured noncontracting parties must show that the "performance of contractual obligation [between others] has induced detrimental reliance [by them] on continued performance and inaction would result not 'merely in withholding a benefit, but positively or actively in working an injury’ ”
 
 (Eaves Brooks Costume Co. v Y.B.H. Realty Corp.,
 
 76 NY2d 220, 226,
 
 supra,
 
 citing
 
 Moch Co. v Rensselaer Water Co.,
 
 247 NY 160, 167,
 
 supra).
 
 The nexus for a tort relationship between the defendant’s contractual obligation and the injured noncontracting plaintiff’s reliance and injury must be direct and demonstrable, not incidental or merely collateral
 
 (see, Strauss v Belle Reality Co.,
 
 65 NY2d 399;
 
 White v Guarente,
 
 43 NY2d 356,
 
 supra; Ultramares Corp. v Touche,
 
 255 NY 170).
 

 IV.
 

 The foregoing precedents and principles point the way to our determination of whether Servicemaster’s duty extends to plaintiff-appellant Palka. We conclude it should because she proved not only that Servicemaster undertook to provide a service to Ellis Hospital and did so negligently, but also that its conduct in undertaking that particular service placed Palka in an unreasonably risky setting greater than that, had Servicemaster never ventured into its hospital servicing role at all
 
 (see, Eaves Brooks Costume Co. v Y.B.H. Realty Corp.,
 
 76 NY2d 220,
 
 supra,
 
 citing
 
 Moch Co. v Rensselaer Water Co.,
 
 247 NY 160, 167).
 

 We are convinced that the Appellate Division majority in this case overextended the precise rationale of
 
 Eaves Brooks Costume Co. v Y.B.H. Realty Corp. (supra)
 
 by its ruling limiting the duty range here. First, the property damages categorization of
 
 Eaves Brooks
 
 does not automatically carry over to personal injury claims where other public policies, factors and analytical considerations are in play, as has been explained. As the Court recently observed in
 
 Hall v United Parcel Serv.
 
 (76 NY2d 27, 32,
 
 supra),
 
 had plaintiff "sustained physical injury from the test * * *, there would be no question of his right to maintain a cause of action against the examiner, notwithstanding the absence of a relationship of privity.”
 

 Further, with respect to
 
 Eaves Brooks,
 
 the plaintiff was a commercial tenant who sought to recover property damage sustained when a fire sprinkler system malfunctioned and
 
 *588
 
 flooded the leased premises, destroying the plaintiff’s retail merchandise. The tenant sued New York Automatic Sprinkler Service Co., which was under contract to inspect the sprinkler system at a yearly cost of $120. The tenant also sued Wells Fargo Alarm Services, which contracted to install and maintain a central station fire alarm system for an annual fee of $660. Following the restrictions imposed by
 
 Glanzer
 
 and
 
 Moch,
 
 the Court stated that whether the defendants should be held liable in tort based on a contractual breach turned on "whether the defendant has assumed a duty to exercise reasonable care to prevent foreseeable harm to the plaintiff” (76 NY2d, at 226,
 
 supra).
 
 Our holding in
 
 Eaves Brooks
 
 denying the plaintiff a right to recover in tort against the contracting defendants emphasizes that "a contractual obligation,
 
 standing alone”
 
 in the "ordinary case” will not extend duties beyond the contracting parties
 
 (id.,
 
 at 226 [emphasis added]). The Court then relied on policy considerations to foreclose liability, for example, the plaintiff’s right to seek damages directly from the building’s owners; the building’s owners being in a better position to insure against any property loss in the building; and the limited scope of defendants’ undertaking reflected in the minimum annual services fee arrangement of $120 and $660, respectively. Those factors and policy considerations do not apply in this case and the contractual obligation does not stand alone here
 
 (contrast, Raffa v Stilloe Roofing & Siding,
 
 182 AD2d 901, 902). Here, the traditional, complex and particularized analytical path previously described well supports the result we reach on this record, for unlike
 
 Eaves Brooks
 
 where the Court emphasized a limited contractual undertaking, Servicemaster’s agreement was comprehensive and exclusive. It required Servicemaster to train, manage, supervise and direct all support services employed in the performance of daily maintenance duties
 
 (compare, Boyle v Anderson Fire Fighters Assn.,
 
 497 NE2d 1073 [Ind];
 
 Devine v Kroger Grocery & Baking Co.,
 
 349 Mo 621, 162 SW2d 813;
 
 West Ky. Coal Co. v Hazel’s Adm’x,
 
 279 Ky 5, 129 SW2d 1000;
 
 Stanolind Oil & Gas Co. v Bunce,
 
 51 Wyo 1, 62 P2d 1297;
 
 Sloss-Sheffield Steel & Iron Co. v Wilkes,
 
 231 Ala 511, 165 So 764;
 
 Lough v Davis & Co.,
 
 30 Wash 204, 70 P 491;
 
 Mayer v Thompson-Hutchison Bldg. Co.,
 
 104 Ala 611, 16 So 620). Consistent with the rationale
 
 of Eaves Brooks (supra),
 
 the legal duty is not created solely by the contract but is imposed on a defendant for additional reasons. Moreover, defendant contracted with an owner or possessor to maintain, manage
 
 *589
 
 and inspect property and, thus, defendant "does or ought to foresee the likelihood of physical harm to third persons as a result of reasonable reliance by the owner on [it] to discover or repair dangerous conditions” (Prosser and Keeton, Torts § 93, at 670 [5th ed]).
 

 Notably, too, unlike our decisions in
 
 Moch Co. v Rensselaer Water Co. (supra)
 
 and
 
 Strauss v Belle Realty Co. (supra),
 
 the instant case presents this array of factors: reasonably interconnected and anticipated relationships; particularity of assumed responsibility under the contract and evidence adduced at trial; displacement and substitution of a particular safety function designed to protect persons like this plaintiff; and a set of reasonable expectations of all the parties. These factors, taken together, support imposition of liability against this defendant in favor of this plaintiff.
 

 Here, the functions to be performed by Servicemaster were not directed to a faceless or unlimited universe of persons. Rather, a known and identifiable group — hospital employees, patients and visitors — was to benefit and be protected by safety maintenance protocols assumed and acquired exclusively by Servicemaster. It cannot reasonably claim that it was unaware or that it was entitled to be unaware that individuals would expect some entity’s direct responsibility to perform maintenance services with ordinary prudence and care
 
 (see,
 
 Prosser and Keeton, Torts § 93, at 670 [5th ed];
 
 contrast, Bourk v National Cleaning,
 
 174 AD2d 827,
 
 lv denied
 
 78 NY2d 858). In fact, the very "end and aim” of the service contract was that Servicemaster was to become the sole privatized provider for a safe and clean hospital premises
 
 (see, Glanzer v Shepard,
 
 233 NY 236, 239,
 
 supra).
 

 V.
 

 This record supports the conclusion that Servicemaster undertook a duty and breached the duty to inspect and manage the repair of wall-mounted fans. Nurse Palka was injured as a result of Servicemaster’s negligent performance or nonperformance of that tort duty arising out of its extensive, exclusive maintenance contract. We hold that when a party contracts to inspect and repair and possesses the exclusive management and control of real or personal property which results in negligent infliction of injury, its assumed duty extends to noncontracting individuals reasonably within the zone and contemplation of the intended safety services.
 
 *590
 
 The defendant’s obligation in a case such as this is circumscribed, therefore, not merely by the contract but also in light of the duty imposed by law based on the interrelationship of all the parties, as framed by the evidentiary record.
 

 Accordingly, for these reasons, the order of the Appellate Division should be reversed, with costs, and the judgment based on the jury verdict of liability in plaintiff’s favor should be reinstated.
 

 Chief Judge Kaye and Judges Simons, Smith and Ciparick concur; Judges Titone and Levine taking no part.
 

 Order reversed, with costs, and judgment of Supreme Court, Saratoga County, reinstated.